

FILED

Mar 29 2018, 10:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristine Kohlmeier
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daniel J. Glasgow,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 29, 2018<br><br>Court of Appeals Case No.<br>47A04-1708-CR-1820<br><br>Appeal from the Lawrence Superior Court.<br>The Honorable William G. Sleva, Judge.<br>Trial Court Cause No.<br>47D02-1611-F6-1442 |

**Sharpnack, Senior Judge**

## Statement of the Case

[1] Daniel Glasgow surrendered a syringe to a police officer in response to a question posed prior to a patdown search for weapons. He was charged with,

among other things, Level 6 felony unlawful possession of a syringe.[1] Following a bench trial, he was found guilty. On appeal, he challenges the admission of the syringe, contending that it was obtained as the result of an unlawful search and seizure. Finding that the trial court properly admitted the syringe, we affirm.

## Issue

[2] Glasgow raises one issue for review, which we restate as whether the trial court abused its discretion in admitting the syringe into evidence.

## Facts and Procedural History

[3] Around midnight on November 18, 2016, Officer Logan Smoot, who was assigned to the Lawrence County Sheriff's Department, was driving north on State Road 37 when he observed two vehicles parked one behind the other on the shoulder. One of the vehicles had its flashers on and appeared to be broken down. Glasgow and Gordon Hunt were standing near the vehicles. Officer Smoot stopped behind the vehicles and activated the emergency lights on his mirrors to warn passing traffic. As the officer approached Glasgow and Hunt on foot to offer his assistance, Glasgow walked quickly toward the officer. The officer determined that the rear vehicle belonged to Glasgow and that Hunt had

---

[1] Ind. Code § 16-42-19-18 (2015).

driven the other vehicle to the scene. Officer Smoot recognized Glasgow from prior interactions but was not familiar with Hunt.

[4] Glasgow told Officer Smoot that he had a flat tire and that Hunt had come to assist him. The officer then asked Glasgow and Hunt for their driver's licenses. Glasgow did not have a driver's license but provided the officer with an identification card. Hunt did not have any form of identification with him, so he provided his name and date of birth. Officer Smoot contacted a police dispatcher and was informed that both Glasgow and Hunt had suspended driver's licenses. Officer Smoot also learned that Glasgow's vehicle was uninsured and the license plate was registered to another vehicle.[2]

[5] Instead of arresting the men, Officer Smoot asked Glasgow and Hunt if they could arrange for a ride from someone and if they needed a tow truck for the vehicles. Hunt contacted his girlfriend to pick him up. Glasgow's cell phone battery was too low to make a call.

[6] Approximately five minutes after Officer Smoot arrived at the scene, Officer Timothy Butcher, who was driving by on patrol, stopped to see if Officer Smoot needed assistance. Officer Butcher recognized both Glasgow and Hunt from previous interactions.

---

[2] The police dispatcher initially advised Officer Smoot that Hunt had an active warrant for his arrest but shortly thereafter indicated that the warrant had expired.

[7]     While the officers were waiting for Glasgow and Hunt to arrange rides home, Officer Smoot stood and talked with Glasgow near the open passenger side door of Hunt's vehicle. Hunt stood near the open passenger side door of Glasgow's car. Officer Butcher was standing near Hunt. The open car door was between Hunt and Officer Butcher such that the officer's view of Hunt was partially obstructed.

[8]     At some point, Officer Butcher saw Hunt bend down. Officer Butcher asked Hunt what he was doing, and Hunt responded that he was tying his shoe. Officer Butcher walked to the area where Hunt had bent down and discovered a black jewelry box, underneath a rock, about one and a half feet from the vehicle's front tire. Officer Butcher opened the box and saw a clear bag that contained a white powdery substance. He believed the substance was heroin. Officer Butcher asked Hunt if the box was his. Hunt responded that it was not. Officer Butcher handcuffed Hunt and placed him in his patrol car.

[9]     While Officer Butcher was tending to Hunt, Glasgow was standing with Officer Smoot in the open doorway of the passenger side door of Hunt's car, charging his cell phone so that he could call for a ride home. Officer Smoot saw Officer Butcher escort Hunt to a patrol car. At the time, however, Officer Smoot was unaware of what Officer Butcher had found because he had not heard the exchange between Officer Butcher and Hunt concerning the jewelry box.

[10]    After placing Hunt into his patrol car, Officer Butcher walked toward Glasgow and Officer Smoot. Officer Butcher asked Glasgow if the jewelry box belonged

to him. Glasgow said it did not. Before patting Glasgow down, Officer Butcher asked Glasgow if he had any needles or weapons on him that would "poke us or stick us." Tr. p. 86. Officer Butcher testified that Glasgow "[s]eemed very uneasy" . . . as if "he didn't want [the officers] there." *Id.* Glasgow told the officers he had a syringe; he pulled the syringe from his left front jacket pocket; and, in response to Officer Butcher's command, he placed the syringe on the hood of the car. The syringe appeared to have residue inside. Officer Butcher then asked Glasgow to empty the contents of his pockets onto the hood of the car, and Glasgow complied.

[11] Officer Smoot began patting Glasgow down. As he did so, he asked Glasgow if he had any drugs on his person. Glasgow indicated that he did, pointed to a folded piece of paper he already had placed on the hood of the car, and told the officers that the paper contained heroin.

[12] After the patdown was complete, the officers handcuffed Glasgow and placed him into Officer Smoot's patrol car. Glasgow was transported to jail. Hunt was released from the scene.

[13] On November 18, 2016, the State charged Glasgow with Level 6 felony possession of a narcotic drug and Level 6 felony unlawful possession of a syringe. The State later amended the charging information to add an habitual offender enhancement. On January 31, 2017, Glasgow filed a motion to suppress, seeking to suppress the syringe and the heroin found on his person. The trial court granted the motion as to the heroin that Glasgow had placed on

the hood after being instructed to empty his pockets but denied the motion as to the syringe. The trial court later clarified that it did not suppress the heroin found in the jewelry box. After a bench trial, the trial court found Glasgow not guilty of possession of a narcotic drug but guilty of unlawful possession of a syringe. Glasgow subsequently pleaded guilty to the habitual offender enhancement, and the trial court sentenced him to an agreed aggregate term of four years in the Indiana Department of Correction.

[14] Glasgow now appeals.

# Discussion and Decision

[15] Glasgow contends that the trial court erred in admitting into evidence the syringe that he produced prior to being searched. He maintains that the admission of the syringe into evidence violated his constitutional rights against unreasonable search and seizure under the Fourth Amendment to the United States Constitution and article I, section 11 of the Indiana Constitution because the officers were not justified in effecting a stop and conducting a patdown.

[16] A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We will not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court's ruling, but we also consider any uncontested evidence favorable to

the defendant. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. When, as in the instant case, the admissibility of evidence turns on questions of constitutionality relating to the search and seizure of that evidence, our review is de novo. *Jacobs v. State*, 76 N.E.3d 846, 849 (Ind. 2017).

# I. The Stop

## A. Fourth Amendment

[17] We first address whether Officer Butcher's stop of Glasgow violated his rights under the Fourth Amendment to the United States Constitution. The Fourth Amendment's protection against unreasonable search and seizure has been extended to the states through the Fourteenth Amendment. *See Berry v. State*, 704 N.E.2d 462, 464-65 (Ind. 1998). "As a general rule, the Fourth Amendment prohibits a warrantless search. When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search." *Id*. at 465 (citations omitted).

[18] One exception to the warrant requirement was recognized by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *Terry,* the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot" the officer may briefly stop the suspicious person and make "reasonable inquiries" to confirm or dispel those suspicions. *Id*. at 30, 88 S. Ct. at 1884. We have held that a consideration of

the totality of circumstances should be utilized in determining whether the police had reasonable suspicion to believe there was criminal activity afoot. *Wilson v. State*, 670 N.E.2d 27, 31 (Ind. Ct. App. 1996). This necessarily includes a determination of whether the defendant's own actions were suspicious. *Carter v. State*, 692 N.E.2d 464, 467 (Ind. Ct. App. 1997). While nervousness alone is not enough to support reasonable suspicion, nervousness can constitute reasonable suspicion supporting an investigatory stop when combined with other factors. *Campos v. State*, 885 N.E.2d 590, 597 n.2 (Ind. 2008) (citing *Finger v. State,* 799 N.E.2d 528, 534-35 (Ind. 2003)).

[19] If a police officer has a reasonable fear of danger when making a *Terry* stop, he may conduct a carefully limited search of the suspect's outer clothing in an attempt to discover weapons that might be used to assault him. *Shinault v. State*, 668 N.E.2d 274, 277 (Ind. Ct. App. 1996). In determining whether the officer acted reasonably under the circumstances, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883.

[20] Some encounters between law enforcement officers and public citizens do not implicate the protections of the Fourth Amendment. *Clark v. State*, 994 N.E.2d 252, 261 (Ind. 2013). For example, consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. *Id*; *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389 (1991). Nonconsensual encounters do, though, and typically are

viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop. *Clark*, 994 N.E.2d at 261. The former of these requires probable cause to be permissible; the latter, a *Terry* stop, requires a lower standard of reasonable suspicion. *Id.*

[21] Here the initial encounter between Glasgow, Hunt, and the officers was consensual. Officer Smoot observed Glasgow and Hunt stranded on the side of the road. The officer stopped to determine if the men were okay and to lend assistance. Officer Butcher stopped shortly thereafter to lend assistance. Although the officers determined that both Glasgow and Hunt had suspended licenses the officers did not arrest the men. Instead, the officers merely waited with them while they arranged for rides. However, during the consensual encounter, Hunt bent down to the ground in a suspicious manner. Officer Butcher investigated and found a jewelry box near where Hunt had knelt that contained a substance Officer Butcher determined to be heroin based upon his training and experience. Hunt was handcuffed and placed into a patrol car. Officer Butcher testified that Glasgow was, at that time, not free to leave the scene.

[22] Thus, upon the discovery of the heroin, the consensual encounter became a nonconsensual encounter, a *Terry* stop, that implicated the protections of the Fourth Amendment. *Id.* (determining whether encounter was consensual or involved some level of detention turns on evaluation, under all circumstances, of whether reasonable person would feel free to disregard police and go about his business). As such, we must determine whether under the totality of the

circumstances, Officer Butcher had reasonable suspicion to believe that criminal activity was afoot such that the *Terry* stop of Glasgow was justified.

[23]     Glasgow and Hunt were stopped along the side of a road around midnight. Officer Butcher testified that Glasgow appeared very uneasy, as if he did not want the officers present. While the officers stood with the men, Hunt bent down in a suspicious manner behind an open car door that partially blocked Officer Butcher's view of him. Officer Butcher looked around the area where Hunt had knelt and discovered the jewelry box nearby. The box contained heroin. Although both Glasgow and Hunt denied ownership of the box, considering the totality of the circumstances, we find that Officer Butcher had reasonable suspicion to believe that criminal activity involving Hunt and Glasgow was afoot and that further investigation was necessary. The *Terry* stop was not a violation of Glasgow's Fourth Amendment rights. *See, e.g.*, *United States v. Bailey*, 743 F.3d 322, 337 (2d Cir. 2014) ("persons suspected of discarding criminal evidence are regularly detained pursuant to *Terry* while police search for the discarded item to confirm or dispel their suspicions"); *see also United States v. Vasquez*, 638 F.2d 507, 523-24 (2d Cir. 1980) (approving restraint of fidgety suspect to search shopping bag dropped at his feet and suspected of containing weapon); *United States v. Caruthers,* 458 F.3d 459, 468-69 (6th Cir. 2006) (upholding *Terry* stop while police searched area where detainee "was observed in a position suggesting that he was discarding what . . . might have been a gun"); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998) (upholding *Terry* stop while police searched nearby area where detainee's

furtive movements "could support an inference that the man had left to hide something upon spotting the officers"); *United States v. Robinson,* 30 F.3d 774, 784 (7th Cir. 1994) (approving *Terry* stop for twenty to thirty minutes while police searched area for discarded contraband); *cf. Michigan v. Summers,* 452 U.S. 692, 700 n.12, 101 S. Ct. 2587, 2593, 69 L. Ed. 2d 340 ("If the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual . . . 'while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect . . .'") (quoting 3 LaFave, *Search and Seizure* § 9.2, at 36-37 (1st ed. 1978)).

### B. Indiana Constitution

[24] We next determine whether the officer's stop of Glasgow violated his rights under article I, section 11 of the Indiana Constitution. Article I, section 11 provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure. . . ." Despite the fact that the text of article I, section 11 is nearly identical to the Fourth Amendment, Indiana courts interpret and apply it "independently from federal Fourth Amendment jurisprudence." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). In conducting analysis under this provision, we focus on whether the officer's conduct "was reasonable in light of the totality of the circumstances." *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). In making this determination, we balance: (1) the degree of concern, suspicion, or knowledge that a violation

has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* When police conduct is challenged as violating section 11, the burden is on the State to show that the search or seizure was reasonable under the totality of the circumstances. *State v. Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008).

[25] Glasgow argues that Officer Butcher's concern, suspicion, or knowledge was based upon Glasgow's nervousness; that there was a high degree of intrusiveness imposed upon Glasgow's activities; and that, although there was "some moderate law enforcement need in the temporary detention of Glasgow, this need was heavily outbalanced by the lack of reasonable suspicion and degree of intrusion imposed on him." Appellant's Br. p. 22. The State contends that Officer Butcher had a "justifiably high degree of concern or knowledge that a violation . . . had occurred after he discovered the heroin;" that the degree of intrusion was minimal because the officer "merely questioned Glasgow and did not impede his ordinary activities in any way;" and the law enforcement needs weigh in favor of the officers' actions because "they did not do more than what was reasonably required to investigate the heroin they discovered." Appellee's Br. p. 11.

[26] The record established that the officers stopped to lend assistance to Glasgow and Hunt when they saw the two men standing on the side of the road with their vehicles. Although the officers noticed that the men appeared nervous and that they had suspended licenses, the officers did not arrest the men for the

violations. Instead, the officers allowed the men to arrange for rides. While the officers waited with Glasgow and Hunt, Hunt behaved in a suspicious manner by bending down as if to tie his shoe. When Officer Butcher used his flashlight to inspect the area near where Hunt knelt, he discovered a jewelry box and determined that the box contained heroin.

[27] Based upon these facts, the officers had a high degree of suspicion that a violation had occurred. Regarding the degree of intrusion, it was minimal. Until the box containing heroin was found, the encounter with the officers was consensual. Once the heroin was discovered, the officers, shortly thereafter, secured Glasgow and Hunt and placed them in the patrol cars. Finally, the extent of law enforcement needs after the discovery of the heroin was high because the officers needed to determine whether Glasgow and Hunt were involved in illegal drug activity. We conclude that under the totality of the circumstances, Officer Butcher did not act unreasonably in effecting a stop of Glasgow to further investigate whether he was engaging in illegal drug activity. There was no violation of Glasgow's rights under article I, section 11 of the Indiana Constitution.

## II. Patdown Search

[28] Having found that the stop of Glasgow was lawful, we next address the patdown search. Under the *Terry* stop exception to the warrant requirement, "if [an officer] has reasonable fear of danger, he may conduct a carefully limited search of the outer clothing of the suspect in an attempt to discover weapons that might be used to harm him." *Williams v. State*, 754 N.E.2d 584, 588 (Ind.

Ct. App. 2001), *trans. denied*. To conduct a patdown during a *Terry* stop, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S. Ct. at 1883.

[29] Glasgow contends that Officer Butcher's patdown search was not based upon a reasonable concern for officer safety. As such, the admission of the syringe into evidence violated his constitutional rights against unreasonable search and seizure under the Fourth Amendment to the United States Constitution. Ordinarily we would address Glasgow's contention by examining whether Officer Butcher was justified in believing that his and Officer Smoot's safety was in danger at the time the search was conducted; however, under the circumstances of this case, we do not reach this question because the syringe was not the product of a search but, instead, was produced in response to a question.

[30] As part of the investigation as to whether Glasgow and Hunt were involved in illegal drug activity, and *prior* to conducting the patdown, Officer Butcher asked Glasgow if he had any needles or weapons. The question was asked during a lawful stop; the question was justified by the officer's legitimate concern about being stabbed or poked with a used needle (*see, e.g.*, *Lockett v. State*, 747 N.E.2d 539, 543 (Ind. 2001) (holding that the Fourth Amendment does not prohibit police from routinely inquiring about presence of weapons)); and the questioning did not materially extend the duration of the stop or the nature of

the intrusion (*see Finger*, 799 N.E.2d at 535 ("'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop'") (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983)).

# Conclusion

For the reasons stated above, the trial court properly admitted the syringe into evidence, and the judgment of the trial court is affirmed.

Affirmed.

Kirsch, J., and Pyle, J., concur.